Joyce A. ROBINSON, Plaintiff–Appellant,

v.

BURLINGTON NORTHERN RAILROAD COMPANY, Defendant–Appellee.

No. 97–1289.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 23, 1997.

Decided Dec. 5, 1997.

---

Laurence C. Acker (argued), Monica A. Coscia, Harrington, Thompson, Acker & Harrington, Chicago, IL, for Plaintiff–Appellant.

John Newell (argued), Wysoglad & Associates, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, and RIPPLE and EVANS, Circuit Judges.

RIPPLE, Circuit Judge.

Joyce Robinson, a brakeman for the Burlington Northern Railroad Company ("Burlington" or "the railroad"), was injured while she was directing the switching movement of seventeen railroad cars from one track to another. She brought this action against Burlington under the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60 ("FELA"), alleging that the railroad's negligence caused her injury. Ms. Robinson appeals from the jury's verdict for the railroad and the district court's denial of her motion for a new trial. For the following reasons, we affirm the judgment of the district court.

## I

## BACKGROUND

### A. Facts

On a sub-zero January morning in 1994, Ms. Robinson was assigned to a yard switching job in the Cicero departure yard. As the foreperson of the switch crew, she was to oversee the movement of railroad cars from one track to another. Working with engineer Grant Hinton and brakeman Mike Aguirre as her crew, Ms. Robinson boarded the lead car, positioned herself on the ladder and directed the switching movement using a hand-held radio. Her crew, in the engine cab seventeen cars away, was approximately 900 feet from Ms. Robinson and could not see her. The engine was traveling at the normal switching speed of about 4 miles per hour as it shoved the string of rail cars slightly uphill on number 6 track for a quarter mile. The engineer testified that there was no evidence of defects in the equipment or operation of the train that day.

Each train car was coupled to another and to the engine by a connector called a knuckle that attaches to the drawbar of the next railroad car. Because of the design of the couplers, there is movement or "play" be-

tween the cars. The jerking movement associated with train starts and stops, caused by the extension and retraction of the couplers and drawbars between the cars, is called "slack" action.[1] The amount of slack action varies according to the train's speed, the distance available for the train to stop, the terrain and grade of the track, the type of brakes on the engine and the speed with which the brakes are applied. Engineer Hinton testified that severe slack action could occur, "depending on speed and other variables," if the independent brake is applied too quickly. R.48–3 at 207–08. However, he also testified that the slack action that occurs during a switch, when the train is going only 4 miles an hour, should not be great enough to knock someone off a car. Nevertheless, it is this slack action that Ms. Robinson claims caused her to fall from the ladder of the lead car. We therefore focus on the events leading to Ms. Robinson's fall.

Once the train made the switch onto number 6 track, Ms. Robinson gave the engineer the stop signal; she testified that she had to give a second signal before the train actually stopped. After the train came to a stop, Ms. Robinson testified, she felt a normal slack action and began to dismount from the rail car. At that point, however, she testified that an abnormal, rough slack action occurred. As a result, she lost her balance; when she fell to the ground, her right ankle was injured. Ms. Robinson asserted that normal slack action would not be sufficient to cause someone to lose her grip. According to Ms. Robinson, the cause of the rough slack action was that "[e]ither the equipment

wasn't working properly or the engineer stopped the train too fast." R.48–2 at 69.

Engineer Hinton's report of the circumstances at the time of Ms. Robinson's injury differed from hers. He testified that, as he was shoving the cars further up number 6 track, he lost radio communication with Ms. Robinson. Following normal procedures, therefore, Hinton coasted to a stop as he was required to do until he received further instructions. Perhaps seconds or a minute or so after the train came to a stop, he testified, Ms. Robinson told him, "Okay: Shove them my way." R.433 at 197. Hinton described what he did next: "And then we shoved just a very few feet, maybe a boxcar length or half a boxcar, and she said, 'That'll do.' And then at that time she called Mr. Aguirre down to finish up [the job]." *Id.* The engineer was asked to describe his stop; he testified:

> The initial stop was made basically by coasting down to a stop, because we had no communication, so I had to bring the movement to a stop. And then when we started up again, the engine only moved very, very small, very short distance, and then we stopped again. So both times would have been with the independent brake.

*Id.* at 197–98. Hinton expressed the opinion that the slack would not have been severe under those circumstances. *Id.* at 199.

Kenneth Hamlet, a switchman/brakeman and conductor with the railroad, reported that he was in an engine several tracks away

1. Chief Justice Stone, writing for the Supreme Court, described slack action thus:

   Slack action is the amount of free movement of one car before it transmits its motion to an adjoining coupled car. This free movement results from the fact that in railroad practice cars are loosely coupled, and the coupling is often combined with a shock-absorbing device.... Loose coupling is necessary to enable the train to proceed freely around curves and is an aid in starting heavy trains, since the application of the locomotive power to the train operates on each car in the train successively, and the power is thus utilized to start only one car at a time.

   The slack action between cars due to loose couplings varies from seven-eighths of an inch to one and one-eighth inches and, with the added

free movement due to the use of draft gears, may be as high as six or seven inches between cars. The length of the train increases the slack since the slack action of a train is the total of the free movement between its several cars. The amount of slack action has some effect on the severity of the shock of train movements, and on freight trains sometimes results in injuries to operatives, which most frequently occur to occupants of the caboose. The amount and severity of slack action, however, are not wholly dependent upon the length of train, as they may be affected by the mode and conditions of operation as to grades, speed, and load. And accidents due to slack action also occur in the operation of short trains. *Southern Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 776–77, 65 S.Ct. 1515, 1523–24, 89 L.Ed. 1915 (1945).

from track number 6 on the morning in question. He testified that he heard, on his radio, the communication between Ms. Robinson and her crew. His testimony indicated that, after she had ordered the engineer to move the train 5 car lengths, she stated, "That'll" and then "it's like she got cut off in the middle of sentence or something." R.48-4 at 393. Hamlet testified that he "heard the crew calling her saying, 'Did you say "that will do," Joyce?'" but she did not respond on the radio.[2] *Id.* at 394.

Hamlet also described the view he had of the rail cars on track 6; he stated that he briefly saw Ms. Robinson as the car on which she was riding passed him on that adjacent track. Hamlet testified that Ms. Robinson was positioned on the back of the car rather than on the side ladder. He also testified that he had noticed that, when the train stopped, the stop appeared smooth and nothing indicated that there was a rough slack action. When he did not hear Ms. Robinson's response on the radio, however, Hamlet got off the engine and walked over to track 6, intending to let Ms. Robinson use his walkie-talkie to complete the move; he found her hobbling on one foot.

At trial Ms. Robinson offered another factor which may have contributed to her accident. She testified that, on that morning, she was wearing the "Iceman" boots which the railroad had provided its employees for cold weather conditions. Those boots were, according to Ms. Robinson, awkward and slippery and too wide for her feet to fit on the bottom rung, or stirrup, of the ladder. Because of those boots, she testified, her left foot slid across the rung and she lost her balance.

**B.  *Jury Determination***

This case came to trial on December 16, 1996. Ms. Robinson alleged that her injury while working on one of Burlington's trains was caused by the railroad's negligence: by an equipment malfunction, by the engineer's excessively abrupt application of the brake, by the clumsy and slippery boots provided by the railroad, or by a combination of those factors. Among the claims in her complaint

and at trial was one based on the theory of *res ipsa loquitur.* The complaint stated:

> [A]t the time and place alleged the cut of cars, the persons operating movement of the cut of cars, the throttle and braking system, and all of the appurtenances of the locomotive and cars were under the maintenance, operation and control of and in the exclusive possession of the defendant, and severe slack action occurred causing plaintiff to be thrown from the side ladder of car and to be injured, and accidents of the nature described herein do not occur in the ordinary course of operations if defendant had used ordinary care.

R.1 ¶ 8(a). Ms. Robinson proposed a *res ipsa loquitur* jury instruction; however, the court refused to give it.

On December 19, 1996, the jury returned a verdict in favor of the railroad. The trial court denied Ms. Robinson's motion for a new trial. This appeal was filed in timely fashion.

## II

## DISCUSSION

**A.  *The Res Ipsa Loquitur Jury Instruction***

### 1.

■ Ms. Robinson's claim is based upon FELA, a federal statute providing that a railroad is "liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. The Supreme Court has construed liberally this statute in order to promote the remedial goal of allowing recovery for injuries and deaths of railroad workers, in recognition of the physical dangers of such work. *See Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, 543, 114 S.Ct. 2396, 2404, 129 L.Ed.2d 427 (1994). Nevertheless, the Court has made clear that the statute does not turn a railroad into the workers' insurer. "'The basis of [the employer's] liability is his negligence, not the fact that injuries occur.'" *Id.*

---

**2.** Hamlet explained that "that'll do" means     "stop." R.48-4 at 393.

(quoting *Ellis v. Union Pac. R. Co.*, 329 U.S. 649, 653, 67 S.Ct. 598, 600, 91 L.Ed. 572 (1947)).

■ "What constitutes negligence for the statute's purposes is a federal question, not varying in accordance with the differing conceptions of negligence applicable under state and local laws for other purposes." *Urie v. Thompson*, 337 U.S. 163, 174, 69 S.Ct. 1018, 1027, 93 L.Ed. 1282 (1949). In *Urie*, the Court also recognized that FELA "is founded on common-law concepts of negligence and injury, subject to such qualifications as Congress has imported into those terms." *Id.* at 182, 69 S.Ct. at 1030–31. In *Gottshall* the Court reiterated that principle. *See* 512 U.S. at 543, 114 S.Ct. at 2404. In conformity with *Urie* and *Gottshall*, we have declared that it is well settled that we treat negligence claims under FELA as federal questions. *See Gillman v. Burlington N. R.R. Co.*, 878 F.2d 1020, 1022 (7th Cir.1989).[3]

■ The doctrine of *res ipsa loquitur* (a Latin phrase meaning "the matter speaks for itself") is applicable in FELA cases and, in appropriate circumstances, permits an inference of negligence on the part of the railroad for railroad-related injuries. The Supreme Court set forth the prerequisites for invoking a *res ipsa loquitur* claim in a FELA action in *Jesionowski v. Boston & Maine Railroad*, 329 U.S. 452, 67 S.Ct. 401, 91 L.Ed. 416 (1947):

"[W]hen a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, and the injury is such as in the ordinary course of things does not occur if the one having control uses proper care, it

affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care."

*Id.* at 456, 67 S.Ct. at 403 (quoting *San Juan Light & Transit Co. v. Requena*, 224 U.S. 89, 98–99, 32 S.Ct. 399, 401, 56 L.Ed. 680 (1912)). Following *Jesionowski*, other circuits have formulated more precise approaches to the doctrine's applicability. An approach that recurs in the case law of the circuits is the Fourth Circuit's formulation requiring the satisfaction of three conditions:

(1) the injury for which the plaintiff seeks recovery must be of a kind that ordinarily does not occur in the absence of negligence; (2) the injury must have been caused by some agency or instrumentality within the exclusive control of the defendant; and (3) the injury must not have been due to any contribution or voluntary activity on the part of the plaintiff.

*Stillman v. Norfolk & W. Ry.*, 811 F.2d 834, 836–37 (4th Cir.1987).

Another formulation of the FELA *res ipsa* requirement articulated by the federal courts is based on the Restatement (Second) of Torts:

[A]n inference of causation based on the *res ipsa loquitur* doctrine requires that (1) the event be of a kind which ordinarily does not occur in the absence of negligence, (2) other responsible causes, including conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence, and (3) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

*Beissel v. Pittsburgh & Lake Erie R.R. Co.*, 801 F.2d 143, 149 (3d Cir.1986) (citing Re-

---

3. *Accord Aparicio v. Norfolk & W. Ry. Co.*, 84 F.3d 803, 810 n. 3 (6th Cir.1996) ("The Supreme Court has stated that federal common law controls what constitutes negligence under the Federal Employers' Liability Act."); *Morant v. Long Island R.R.*, 66 F.3d 518, 522 (2d Cir.1995) (stating that FELA is governed by federal decisional law: by federal statutory provisions and federal common law doctrines); *Bloom v. Consolidated Rail Corp.*, 41 F.3d 911, 915 (3d Cir.1994) (treating Justice Souter's statement in *Gottshall* that federal courts ought to develop a federal common law of negligence under FELA "as an injunction to look at common-law precedent, state and federal, and to build upon it"); *Wooden v.*

*Missouri Pac. R.R. Co.*, 862 F.2d 560, 561 (5th Cir.1989) ("For the purposes of the FELA, negligence is defined by federal common law."); *Brown v. Cedar Rapids & Iowa City Ry. Co.*, 650 F.2d 159, 160 (8th Cir.1981) ("Under the FELA, negligence must be determined by common law principles as established and applied in federal courts."); *Barboza v. Texaco, Inc.*, 434 F.2d 121, 122 (1st Cir.1970) (noting that federal, not state, law governs in FELA actions); *cf. Graf v. Elgin, Joliet & E. Ry. Co.*, 697 F.2d 771, 776–77 (7th Cir.1983) (concluding that plaintiff's contract claim against the railroad arises under federal common law).

statement (Second) of Torts, § 328D (1965)), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1296, 94 L.Ed.2d 152 (1987).

One of the most succinct expressions of the general rule was stated in *Pennsylvania Railroad Co. v. Pomeroy,* 239 F.2d 435 (D.C.Cir.1956), *cert. denied,* 353 U.S. 950, 77 S.Ct. 861, 1 L.Ed.2d 859 (1957):

> In general, the rule is that, where an injury occurs which in the ordinary course of things would not have occurred if the one having control had used proper care, a reasonable basis is afforded, in the absence of any explanation, to attribute the injury to the lack of care on the part of the defendant.

*Id.* at 446.

These formulations, although helpful to a court's analysis, must be implemented with care. In *Jesionowski,* which remains the governing precedent, the Supreme Court emphasized that, in the context of FELA cases, federal courts were to avoid "conceptualistic" interpretations of the *res ipsa loquitur* doctrine that might unduly restrict the "jury's power to draw inferences from facts." *Jesionowski,* 329 U.S. at 457, 67 S.Ct. at 403–04. The Fifth Circuit, in *Dugas v. Kansas City Southern Railway Lines,* 473 F.2d 821 (5th Cir.), *cert. denied,* 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973), elaborated on the Supreme Court's caution. It noted that, in *Jesionowski,* the Supreme Court permitted the application of the doctrine even when there was some evidence that the plaintiff's participation in the employer's activity might have produced the accident. The Fifth Circuit's discussion of *Jesionowski* is instructive:

> In that case a brakeman, while in the process of switching cars, was killed when a car was derailed, throwing him to his death. The Court of Appeals for the First Circuit had held that *res ipsa loquitur* could not be invoked in an extraordinary accident growing out of a set of circumstances which included activity of the injured person. Evidence on behalf of the

railroad was sufficient to authorize, but not compel, a jury finding that the derailment was caused by the negligence of the deceased in handling the switch. There was other evidence from which a jury could have found that the derailment was caused by a defect in a frog operated with a spring mechanism. This was disputed by evidence to the effect that the frog and switch were in good condition both before and after the derailment.

Subsequent to a discussion of the general principles applicable to the use of *res ipsa,* the Supreme Court held that the rule as applied by the First Circuit

> ... would bar juries from drawing an inference of negligence on account of unusual accidents in all operations where the injured person had himself participated in the operations, even though it was proved that his operations of the things under his control did not cause the accident. This viewpoint [un]duly restricts the power of juries to decide questions of fact, and in this case the jury's right to draw inferences from evidence and the sufficiency of that evidence to support a verdict are Federal questions. A conceptualistic interpretation of *res ipsa loquitur* has never been used by this Court to reduce the jury's power to draw inferences from facts. Such an interpretation unduly narrows the doctrine as this Court has applied it.

*Dugas,* 473 F.2d at 824–25 (quoting *Jesionowski,* 329 U.S. at 457, 67 S.Ct. at 403–04).

In short, the Supreme Court took the view that a jury can be instructed first to determine whether the plaintiff's conduct was a contributing factor to the accident. If the jury finds that the plaintiff's conduct did not contribute to the accident, it then can employ the doctrine of *res ipsa loquitur* to determine whether the accident was caused by the employer.[4] Later, however, the Supreme Court

---

4. Justice Black, writing for the Court in *Jesionowski,* explained:

Derailments are extraordinary, not usual, happenings. When they do occur, a jury may fairly find that they occurred as a result of negligence. It is true that the jury might have found here that

this accident happened as a result of the negligence of the deceased; but although the respondent offered evidence to establish this fact, it "did not satisfy the jury." With the deceased freed from any negligent conduct in connection with the switch or the signaling, we have left an

emphasized that this approach was designed for the situation in which it was clear that the occurrence, absent the possible negligence of the plaintiff, was extraordinary in nature, not a usual happening, and therefore subject to the inference that it "occurred as a result of negligence." *Herdman v. Pennsylvania R.R. Co.*, 352 U.S. 518, 520, 77 S.Ct. 455, 456, 1 L.Ed.2d 508 (1957). "The rule deals only with permissible inferences from unexplained events." *Johnson v. United States*, 333 U.S. 46, 49, 68 S.Ct. 391, 393, 92 L.Ed. 468 (1948).

### 2.

We now apply these general principles to the record before us.

Ms. Robinson contended at trial that her injury was caused by the abnormally severe slack action that occurred while she was riding on the ladder of the lead railroad car. She claimed that such rough slack does not occur without either equipment failure or mishandling by a railroad employee and that, as a result, her injury was caused by the negligence of the railroad. Having presented sufficient evidence to support this theory

of the case, she submits, the jury should have been given a *res ipsa loquitur* instruction.[5] According to Ms. Robinson, the trial court's refusal to give her requested *res ipsa* jury instruction was prejudicial, not harmless, error.

When a trial court refuses to give a proposed jury instruction, we review the allegedly erroneous omission of that instruction "with an eye towards the adequacy of the instructions actually given." *Kovacich v. Benjamin*, 951 F.2d 114, 116 (7th Cir.1991). Our role in considering jury instruction challenges is limited. *See E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1283 (7th Cir.1995). "The submission of inadequate jury instructions requires reversal only if 'it appears that the jury's comprehension of the issues was so misguided that one of the parties was prejudiced.'" *Soller v. Moore*, 84 F.3d 964, 969 (7th Cir.1996) (quoting *In re CLDC Management Corp.*, 72 F.3d 1347, 1353 (7th Cir.) (citations omitted), *cert. denied*, —— U.S. ——, 117 S.Ct. 166, 136 L.Ed.2d 108 (1996)). To make that determination, we evaluate the jury instructions altogether, as a whole, for their sufficiency in

---

accident, ordinarily the result of negligence, which may be attributed only to the lack of care of the railroad, the only other agency involved. Once a jury, having been appropriately instructed, finds that the employee's activities did not cause the derailment, the defendant remains as the exclusive controller of all the factors which may have caused the accident. It would run counter to common everyday experience to say that, after a finding by the jury that the throwing of the switch and the signaling did not contribute to the derailment, the jury was without authority to infer that either the negligent operation of the train or the negligent maintenance of the instrumentalities other than the switch was the cause of the derailment. It was uncontroverted that the railroad had exclusive control of both. We think that the facts support the jury's findings both that the deceased's conduct did not cause the accident and that the railroad's negligence did.
329 U.S. at 458, 67 S.Ct. at 404 (quoting *Southern Ry.–Carolina Div. v. Bennett*, 233 U.S. 80, 86, 34 S.Ct. 566, 567, 58 L.Ed. 860 (1914)).

**5.** Ms. Robinson proposed the following jury instruction:

Under our law Joyce Robinson may attempt to prove in either of two ways that Burlington Northern Railroad Co. was negligent. She may prove either what Burlington Northern Railroad

Co. actually did or did not do, or, on the other hand she may attempt to prove the following propositions:
First: That Joyce Robinson was injured.
Second: That the injury was received from a train's severe slack action which was under the defendant's control.
Third: That in the normal course of events, the injury would not have occurred if the defendant had used ordinary care while the train and its brake system was under its control. [management]. [sic]
If you find that each of these propositions has been proved, the law permits you to infer from them that the defendant was negligent with respect to the operation of its train while it was under its control or management.
If you do draw such an inference, and if you further find that the plaintiff's injury was caused in whole or in part by that negligence, your verdict should be for the plaintiff. On the other hand, if you find that any of these propositions has not been proved, or if you find that the defendant used ordinary care for the safety of the plaintiff in its control of the train and its brake system, or if you find that the defendant's negligence, if any, was not a cause in whole or in part of the plaintiff's injury, then your verdict should be for the defendant.
R.19, Plaintiff's Proposed Jury Instruction No. 39.

informing the jury correctly of the applicable law.

■ Our examination of the record in this case reveals that there was an instruction about severe slack action; the jury was instructed that "plaintiff claims that the defendant was negligent because defendant failed to manage and control its train to avoid excessive slack action." R.48–4 at 480. Therefore Ms. Robinson's theory of the case was placed before the jury. *See United Airlines, Inc. v. United States,* 111 F.3d 551, 555 (7th Cir.1997) (affirming that district court's rejection of instruction did not deprive jury of statement of critical element in the government's theory of the case); *Kovacich,* 951 F.2d at 116 ("If the substance of the tendered instruction is sufficiently covered by other instructions, the refusal of such an instruction will not ordinarily constitute error."). In addition, we note that the jury heard extensive details about this central claim during Ms. Robinson's opening and closing statements and in the witnesses' testimony. The jury was well apprised of her theory of the case.

Nor can we conclude that the proposed instruction correctly stated the law of *res*

*ipsa loquitur* in FELA cases as mandated by the Supreme Court in *Jesionowski.* It did not require the jury to conclude that the cause of her injury had to be under the defendant's exclusive control and that she, the injured person, had been without fault in the matter.[6]

Finally, we believe that Ms. Robinson's submission must fail because there was evidence before the jury that permitted its members to conclude that her injury was due to negligence on her part and that the railroad was not negligent. *Res ipsa* does not apply when the accident could have occurred in the absence of the defendant's negligence. In this case, there was evidence before the jury that Ms. Robinson had positioned herself on the back of the car on which she was riding rather than on the side, the correct position. There was also evidence that there was no unusual slack action as the train came to a stop. Therefore the accident could have occurred without any negligence on the part of the railroad.[7]

## B. *Denial of Motion for a New Trial*

■ Ms. Robinson also argued to the district court that the jury verdict was

---

**6.** Although *Jesionowski* does not preclude an instruction on *res ipsa loquitur* when the plaintiff's allegedly negligent acts are part of the employer's general activity, that case does require that, before employing the doctrine, the jury first eliminate the possibility that the plaintiff's activity contributed to the injury. *See supra* note 4 and accompanying text.

In *Jesionowski,* the activity of the plaintiff was easily segregable from other actions of the defendant and therefore the jury could have determined with comparative ease whether the plaintiff had contributed to the injury. In this case, Ms. Robinson's role was an integral part of the activity of the employer. Indeed, she was directing that activity. As the foreperson of the crew, she had a significant degree of control over the work being performed; she had a substantial part in controlling the movement of cars. We need not decide definitively whether under such circumstances the district court would have been obliged by *Jesionowski* to give the *res ipsa loquitur* instruction because the instruction tendered was inadequate to place the matter before the jury.

**7.** Ms. Robinson's reliance on *Zumwalt v. Gardner,* 160 F.2d 298 (8th Cir.1947), is misplaced. In *Zumwalt,* the switchman, while attempting to

get on the footboard of a diesel switch engine, was injured when "the engine suddenly, unexpectedly, and with an unusual and violent jerk threw and knocked him from the footboard." *Id.* at 300. The testimony at trial revealed that the engine went into an emergency stop as the plaintiff was stepping onto the foothold, and that the engine was under the railroad's exclusive control and management. The Eighth Circuit had no hesitation in applying the doctrine of *res ipsa loquitur* to that case, both because it concluded that the accident would not have occurred but for the negligence of the defendant, and because the issue before the court was whether plaintiff had waived his right to rely on the doctrine. The court stated:

It is practically conceded that the facts and circumstances disclosed surrounding the happening of this accident would ordinarily ... warrant the application of the *res ipsa loquitur* doctrine....

*Id.* at 301. Because the facts in *Zumwalt* reveal a plaintiff without fault and a defendant having exclusive control over the thing that caused plaintiff's injury, and because the parties essentially agreed that the injury would not have occurred if the defendant had used ordinary care, the facts are clearly distinguishable from those now before us.

against the manifest weight of the evidence and that the trial court should have granted her motion for a new trial. "The district court may grant a new trial 'only where the verdict is again.t the clear weight of the evidence, and ᵥe will reverse the district judge's decision only where there is a clear abuse of discretion.'" *Trzcinski v. American Cas. Co.*, 953 F.2d 307, 315 (7th Cir.1992) (quoting *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1407 (7th Cir.1991)). As long as there is a reasonable basis in the record to support it, we will not overturn a jury's verdict.

In this case, Ms. Robinson was the only witness who testified that the railroad was negligent. The inconsistencies between her testimony and the testimony of other witnesses allowed the jury to parse the facts, to weigh the credibility of each witness and to disregard the testimony it found less credible or incredible. This role of fact assessing and credibility weighing is clearly within the province of the jury. After our review of the evidence, we agree that there is a reasonable basis in the record for the jury verdict. *See Maier v. Lucent Techs., Inc.*, 120 F.3d 730, 738 (7th Cir.1997). The district court did not abuse its discretion by denying the motion for a new trial.

### Conclusion

For the reasons we have discussed above,[8] we affirm the judgment of the district court.

AFFIRMED.

---

8. Ms. Robinson's last argument concerns the calculation of her lost wages. Because we affirm the judgment of the district court that the rail-road was not negligent, we need not address the damages claim Ms. Robinson raised.