**WESTCHESTER FIRE INSURANCE COMPANY, Plaintiff–Appellee/Cross–Appellant,**

v.

**GENERAL STAR INDEMNITY COMPANY, Defendant–Appellant/Cross–Appellee.**

Nos. 97–4035, 98–1030.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1999.

Decided June 16, 1999.

Rehearing Denied July 26, 1999.

Edward R. Ruberry, Bollinger, Ruberry & Garvey, Chicago, IL, for Westchester Fire Ins. Co. in No. 97–4035.

Mark F. Wolfe (argued), Bollinger, Ruberry & Garvey, Chicago, IL, for Westchester Fire Ins. Co. in No. 98–1030.

William R. Quinlan (argued), Caesar A. Tabet, James A. Niewiara, Brian J. Alesia, Quinlan & Crisham, Chicago, IL, for General Star Indem. Co. in No. 97–4035

John L. McMullin, Brown & James, St. Louis, MO, for General Star Indem. Co. in No. 98–1030.

Before BAUER, CUDAHY and ROVNER, Circuit Judges.

CUDAHY, Circuit Judge.

Allen Little died at work at an iron-making facility in Granite City, Illinois, when he was run over by a dump truck owned and operated by St. Louis Slag Products Company. His widow filed a wrongful death action against St. Louis Slag and various other defendants in Illinois state court. St. Louis Slag was insured by General Star Indemnity (GenStar) for $1 million and had an excess policy with Westchester Fire Insurance Company for $5 million.[1] The other defendants dropped out of the picture, the case proceeded to trial, and GenStar eventually settled for $2 million. Westchester paid $1 million toward the settlement and then sued GenStar for breach of its duty to settle the case within the primary policy's $1 million limit. Following a one-week trial in the district court, a jury returned a verdict for Westchester in the amount of $1 million. GenStar appeals (1) the district court's denial of its post-trial motions for judgment as a matter of law or, alternatively, for a new trial, and (2) a jury instruction. Westchester cross-appeals the district court's denial of pre-judgment interest and attorney's fees. We affirm on all issues.

*Background*

The history of the *Little* case involves a confusing cast of characters and a complex web of communications between the various interested parties. Jacqueline Little filed suit for wrongful death seeking to recover damages for lost earnings, loss of consortium and loss of support for herself and her two daughters, one of whom suffers from a mental disability. When St. Louis Slag notified GenStar that it had been served with process, GenStar referred the handling of the suit to the law firm of Hinshaw & Culbertson in Belleville, Illinois. William Kopis, a partner in the firm, headed the defense of St. Louis Slag. In addition to St. Louis Slag, three other parties were named, or later added, as defendants: two alleged manufacturers of the truck, General Motors (GM) and a Brazilian company, Terex D.O., and the truck distributor, Udelson Equipment Company.

Ronald Loesch acted as St. Louis Slag's corporate representative for the purposes of the *Little* action.[2] At the outset, Loesch told Kopis that St. Louis Slag viewed this as a serious case in which its liability was clear and there was a need to settle. This assessment was shared by several GenStar representatives who reviewed the case, including claims examiner, Elise Henderlite.[3] Members of Kopis's legal team initially valued the case in the range of $1.5 to $2 million. However, on August 3, 1990, Kopis retracted earlier estimates and put his assessment at $600,000 to $800,000 with the possibility of a $1 million verdict. Kopis estimated the settlement value of the case in the range of $450,000 to $550,000 based in part on the likelihood that liability and consequent damages could be shared among the several defendants. GenStar set up a reserve—its best estimate of the insured's exposure—at $850,000.

Some months later, settlement negotiations began in earnest. On March 27, 1991, the plaintiff's attorney, Gregory Becker, opened the bidding with a formal demand of $2.5 million from all defendants. At a settlement conference on September 10, 1992, Kopis offered a structured settlement of $400,000 on behalf of St. Louis Slag. Becker responded by reducing the

---

1. Westchester succeeded to the rights of St. Louis Slag's original excess insurer, International Insurance Company.

2. Loesch is in fact a representative of LaFarge Corporation which acquired St. Louis Slag in the time between Little's death and the filing of the wrongful death action. For ease of discussion, we refer to St. Louis Slag throughout, recognizing that the interests of St. Louis Slag and LaFarge coincide for present purposes.

3. This was also the position of Crawford & Company, an adjusting firm that GenStar enlisted to conduct a preliminary assessment of the case.

plaintiff's demand to $2 million. On December 28, 1992, the attorneys representing each of the parties in the case convened a second settlement conference. The plaintiff's demand was further reduced to $1.5 million, cumulatively, from all defendants. Kopis and James Early, GenStar's settlement consultant, spoke with counsel for the co-defendants. GM and Udelson each agreed to put up $10,000 and Kopis reiterated St. Louis Slag's offer of $400,000. Becker rejected the global offer of $420,000 and negotiations broke down.

Immediately after the conference, Kopis and Early informally asked Becker what it would take to let St. Louis Slag out of the case. It is undisputed that Becker floated the figure of $1 million but the parties offer conflicting characterizations of Becker's words. GenStar asserts that the reference to $1 million was a mere "suggestion" and that the plaintiff's formal demand remained fixed at $1.5 million. GenStar points out that Becker testified at trial that he did not recall making an offer of $1 million and admitted that he lacked the authority to settle at that amount. Westchester contends that Becker's representation amounted to an offer to settle the case for $1 million and it marshals documentary evidence in support. In a post-conference letter to Henderlite dated December 28, 1992, Early stated that the plaintiff's "demand" against St. Louis Slag was $1 million. Similarly, in summarizing the settlement conference, Kopis reported to Henderlite: "Plaintiff's attorney offered to let St. Louis Slag out of the case for a payment of $1,000,000." Several subsequent documents—including GenStar memoranda and correspondence between Westchester and GenStar—refer to the plaintiff's representation as a million-dollar "offer." However characterized, Becker's representation prompted Kopis and Early to close the post-conference discussion with an offer of $430,000 from St. Louis Slag alone.

When Westchester received a copy of Kopis's report of the second settlement conference, Sara Rosamond, a Westchester claims adjuster, wrote to Henderlite requesting that GenStar settle the case within the primary policy limit. GenStar had reservations about whether the plaintiff was serious about settling given her failure to appear personally at either of the settlement conferences. Believing that the plaintiff's demand was excessive, Kopis advised against raising GenStar's offer. Months slipped by without an overture by either side to bridge the bargaining gap. In August 1993, Early recommended approaching the plaintiff in order to break the stalemate. However, Kopis continued to advise against raising GenStar's offer, arguing that GenStar would effectively be bidding against itself. In subsequent discussions, Henderlite told Kopis that GenStar was willing to offer more in order to settle. But in a letter dated April 7, 1994, Kopis again advised Henderlite against increasing the offer. He pointed to fresh evidence that the plaintiff's calculation of lost earnings was overstated and noted that, if anything, GenStar's previous offer was too generous.

In the following months, a number of unexpected developments caused Kopis to revise his assessment. First, in May 1994, St. Louis Slag's expert witness withdrew from the case on medical grounds. Kopis found another expert, but his deposition testimony proved unhelpful, and Kopis ultimately decided to drop him from the case. Second, in June 1994, the plaintiff retained a seasoned trial attorney, Bruce Cook, to act as Becker's co-counsel. Third, new damaging evidence relating to St. Louis Slag's maintenance and operation of the truck was unearthed during discovery. Fourth, St. Louis Slag emerged as the only real defendant in the case: GM had not in fact manufactured the truck and Terex had gone into receivership, leaving Udelson (the distributor) as the only other viable defendant. Finally, the plaintiff obtained the leave of the court to add a wilful

and wanton claim against St. Louis Slag, albeit without the possibility of punitive damages. Based on these developments, Kopis increased his estimated verdict to between $800,000 and $1.2 million and, by September 1994, to between $1 million and $1.5 million.

On August 3, 1994, Rosamond wrote to Henderlite, conveying Westchester's concern that GenStar re-open settlement negotiations. Kopis had already contacted Cook about the possibility of settlement but Cook had indicated that he would only discuss a global settlement involving all defendants. On September 13, 1994, Cook increased the plaintiff's demand to $4.2 million. GenStar took the view that Cook's offer brought negotiations back to square one. Kopis now advised that the case could settle at or near $1 million. On September 13, 1994, Rosamond's supervisor at Westchester, Nancy McCollum, wrote to Henderlite pressing GenStar to settle the case up to the full $1 million limit of the primary policy, if necessary. McCollum sent a second letter—dated September 19 but according to Henderlite not received until September 23—asserting that if GenStar failed to settle within the limits of its policy, Westchester would sue to recover any payments it was forced to make.

The *Little* case went to trial on September 20, 1994 and, on the second day, the parties settled for $2 million. Westchester, as excess insurer, paid $1 million toward the settlement. It then sued GenStar in state court seeking to recover its contribution on the ground that GenStar had breached its duty to settle within the limits of the primary policy. The case was removed to the district court and proceeded to trial. Westchester persuaded the jury that GenStar's failure to settle within its policy limits violated the legal duty that a primary insurer owes an excess insurer to protect its interests in settlement negotiations with the victims of the insured. The jury returned a verdict for Westchester in the amount of $1 million.

*Post–Trial Motions*

GenStar challenges the district court's denial of its post-trial motions for judgment as a matter of law or, alternatively, for a new trial. We review *de novo* the denial of a motion for judgment as a matter of law. See *Tincher v. Wal–Mart Stores, Inc.*, 118 F.3d 1125, 1129 (7th Cir. 1997). Judgment as a matter of law may be entered where "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on [an] issue." FED.R.CIV.P. 50. Reading the record and viewing any reasonably drawn inferences in the light most favorable to Westchester (the non-movant), we must determine whether the verdict is supported by sufficient evidence. See *Tincher*, 118 F.3d at 1129. We review the denial of a motion for a new trial for clear abuse of discretion. See *Robinson v. Burlington Northern R.R.*, 131 F.3d 648, 656 (7th Cir.1997). The district court must determine whether "the verdict is against the weight of evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Winger v. Winger*, 82 F.3d 140, 143 (7th Cir.1996) (internal quotation and citation omitted) (reviewing FED.R.CIV.P. 59(a)). We will not overturn a jury's verdict "[a]s long as there is a reasonable basis in the record to support it." *Robinson*, 131 F.3d at 656.

In Illinois, an insurer is liable to its insured for a judgment exceeding policy limits when the insurer refuses, negligently or in bad faith, to settle litigation within policy limits. See *Certain Underwriters of Lloyd's v. General Accident Ins. Co.*, 909 F.2d 228, 232 (7th Cir.1990); *Steele v. Hartford Fire Ins. Co.*, 788 F.2d 441, 442 (7th Cir.1986). Since the insurer generally has exclusive control over the defense and settlement of a claim, the duty of due care and good faith protects the insured against the possibility that "the insurer would consider only its monetary interests in deciding whether or not to settle, ignoring the risk of an excess verdict which would be borne entirely by the insured." *Certain*

*Underwriters of Lloyd's,* 909 F.2d at 232. The duty that a primary insurer owes to an excess insurer is derivative of the duty to the insured; an excess insurer can use the doctrine of equitable subrogation to assert the insured's right to insist that the primary insurer use due care to avoid an excess judgment against the insured. *See Twin City Fire Ins. Co. v. Country Mutual Ins. Co.,* 23 F.3d 1175, 1178 (7th Cir. 1994). Because equitable subrogation allows one party to step into the legal shoes of another, the excess insurer (the subrogee) acquires no greater or lesser rights than those of the insured (the subrogor). "Thus the actions of the insured, who no longer possesses a financial stake in the outcome of the litigation against it, can defeat the excess insurer's right of recovery by failing to cooperate with the primary insurer or otherwise acting to supply the primary insurer with a defense to a bad faith action." *Certain Underwriters of Lloyd's,* 909 F.2d at 232–33.

■ GenStar concedes that Westchester enjoyed the rights of an equitable subrogee with respect to the *Little* action. It argues, nonetheless, that by consenting at all times to GenStar's trial and settlement strategy, St. Louis Slag (the insured) supplied GenStar with a defense to Westchester's claim for breach of duty. GenStar points out that St. Louis Slag was kept fully informed of Kopis's handling of the case and that it never complained to anyone about Kopis's litigation strategy. While we endorse GenStar's broad proposition—that the insured's consent may bar an excess insurer's claim—we cannot agree that St. Louis Slag supplied the necessary consent to trigger the bar. We have recognized that a primary insurer cannot rely on the consent defense where "the insured's consent to [the primary insurer's] strategy was not unequivocal." *Id.* at 234 (discussing cases). This is such a case.

■ Loesch testified that he told Kopis right from the get-go that St. Louis Slag wanted to settle the case. St. Louis Slag recognized that it was clearly liable for the serious consequences that flowed from the wrongful death of Allen Little; having recently settled another sizable lawsuit, Loesch was anxious to close this case. St. Louis Slag never wavered in its position: Loesch testified that he repeatedly told Kopis and his legal team that St. Louis Slag wanted the case settled. Moreover, St. Louis Slag had no reason to doubt that this position was shared by the other players on the defense side. GenStar and Kopis consistently parroted the theme that this was a clear liability case, destined for settlement within the limits of the primary policy. Insofar as St. Louis Slag consented to Kopis's litigation strategy, it did so on the premise of this shared understanding. In these circumstances, St. Louis Slag's failure to make specific complaints proves little. Liability insurers typically exercise exclusive control over the insured's defense and procure legal representation for that purpose. It is hardly surprising that an insured would leave the matter in the hands of the insurer, assuming—as here—that its own position on trial strategy is clearly understood. St. Louis Slag's failure to complain cannot be read as a ringing endorsement of Kopis's actions in letting the case go to trial and, ultimately, settling well outside the limits of the primary policy. In short, its actions did not signify unequivocal consent and cannot be used by GenStar to dodge the brunt of Westchester's claim.[4]

---

4. GenStar relies on *Puritan Ins. Co. v. Canadian Universal Ins. Co.,* 775 F.2d 76 (3d Cir. 1985), in which the Third Circuit held that an excess insurer's claim was barred where the insured actively endorsed proceeding to trial and the jury reached a verdict in excess of the primary policy limit. The insured, fully aware of excess liability exposure, decided to go to trial in the belief that it would not be found liable. The present case is distinguishable because St. Louis Slag believed that it was liable and joined the chorus in calling for settlement as a damage-limitation exercise.

■ Next, GenStar challenges the sufficiency of the evidence that it breached its duty to Westchester by mishandling the *Little* claim or failing to settle within the limits of the primary policy. GenStar is liable for a want of care in this regard only if (1) it failed to settle the case within the primary policy limits, and (2) there was in fact a chance to settle. *See Twin City*, 23 F.3d at 1181–82. Since the first point is undisputed, the issue here is whether GenStar squandered an opportunity to settle within the primary policy limit.

■ The jury's verdict—and its implicit finding that GenStar should have settled within the limits of the primary policy—may be interpreted in one of two ways. First, the jury may have decided that GenStar breached its duty by failing to accept the plaintiff's offer to settle for $1 million (the limit of the primary policy). GenStar argues that the plaintiff never made such an offer and that her lowest offer was $1.5 million. As noted above, it takes the position that Becker's reference to $1 million, made in the wake of the second settlement conference, was a mere suggestion and that the plaintiff's formal demand remained $1.5 million. GenStar places great store in Becker's testimony—understandably so, since Becker could not recall making an offer of $1 million and testified that, in any event, he lacked the authorization to do so. But other evidence at trial clearly showed that the relevant players in the game, including Kopis, Early, Henderlite and Rosamond, worked on the assumption that the plaintiff had offered to let St. Louis Slag out of the case for $1 million. In particular, Kopis and Early (who had met with Becker and were in the best position to judge his representation) led the others to believe that there was a firm offer of $1 million on the table. In short, the evidence cuts both ways. And the jury was entirely within the pale to decide on the facts presented that the plaintiff had made a firm offer to settle the case for $1 million, the limit of the primary policy.

The jury's verdict is also open to a second interpretation. Whether Becker offered or merely suggested settlement at $1 million, his statement represented a considerable retreat from the plaintiff's first formal demand of $2.5 million. By reducing the demand and agreeing to negotiate an individual settlement with St. Louis Slag, Becker signaled a willingness to compromise. The jury may have concluded that GenStar failed to seize the initiative and bring the case to a close. Early, GenStar's settlement consultant, had a different reading of the situation: he was skeptical about the plaintiff's interest in settlement. But by August 1993, some eight months after the second settlement conference, Early himself was recommending that GenStar attempt rapprochement. The obstacle was Kopis's steadfast adherence to GenStar's existing offer of $430,-000, born of a belief that the plaintiff had overvalued the case. But recall that the figure of $1 million was not too far above the GenStar reserve of $850,000 nor Kopis's own initial estimate range of $600,000 to $800,000. Kopis's—and by extension GenStar's—stubborn refusal to pursue settlement negotiations at this time was all the more curious given the consensus that this was a clear liability case. In fact, Kopis dallied more than 18 months after the second settlement conference before resuming settlement talks in earnest. In the meantime, of course, the defense's trial prospects had taken a turn for the worse. In these circumstances, a jury could reasonably conclude that GenStar lost a golden opportunity to seize the initiative and bridge the bargaining gap. After all, at no time did GenStar offer more than $430,000 to settle the case—a figure well below GenStar's reserve and Kopis's estimate. On these facts, we cannot say that the jury's verdict was against the weight of the evidence. The district court correctly refused to direct a verdict in GenStar's favor and it acted within its discretion in refusing to grant GenStar a new trial.

*Jury Instruction*

The district court exercises its discretion in instructing the jury, and our review of jury instructions is limited accordingly. *See Bauer v. J.B. Hunt Transp., Inc.*, 150 F.3d 759, 763 (7th Cir. 1998). Jury instructions are construed in their entirety rather than in isolation and are reviewed with an eye to their overall fairness and accuracy. *See Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 847 (7th Cir.1998). We reverse only if "it appears that the jury was misled and its understanding of the issues was seriously affected to the prejudice of the complaining party." *Humphrey v. Staszak*, 148 F.3d 719, 723 (7th Cir.1998) (internal quotation and citation omitted).

GenStar challenges the district court's use of Plaintiff's Instruction 13 which cast GenStar and Kopis in an agency relationship. Specifically, the district court instructed the jury as follows:

> William Kopis, Mark Baumann and the firm of Hinshaw & Culbertson were the agent of General Star Indemnity Company at and before the time of this occurrence. Therefore, any act or omission of the agent at that time was in law an act or omission of the defendant General Star Indemnity Company.

GenStar notes that all the parties involved acquiesced in Kopis's handling of the case. From this, GenStar argues that, absent any evidence of culpable conduct on the part of Kopis, there was no basis for the court to instruct the jury that GenStar would be liable for Kopis's acts or omissions. But this argument seems to beg the question. As noted above, the evidence at trial suggested that the parties' consent to Kopis's trial strategy was less than unequivocal. In any event, the issue of acquiescence is hardly dispositive of culpability. The instruction—based on Illinois Pattern Instruction 50.02—was supported by evidence that GenStar exercised control over Kopis in the manner of a principal over an agent. The jury heard that GenStar hired Kopis, paid his fees

and determined his settlement authority. There is no basis for believing that the jury was misled as to whose interests Kopis represented. Thus, we conclude that the district court acted within its discretion in issuing the instruction.

*Pre–Judgment Interest and Attorney's Fees*

Westchester's cross-appeal is easily disposed of. It challenges the district court's determinations that it was not entitled to pre-judgment interest and/or attorney's fees because it had sued GenStar in negligence. We review both decisions for abuse of discretion. *See Ross–Berger Cos. v. Equitable Life Ass. Soc.*, 872 F.2d 1331, 1339 (7th Cir.1989); *Songer v. State Farm Fire & Casualty Co.*, 106 Ill.App.3d 141, 62 Ill.Dec. 150, 435 N.E.2d 948, 951–52 (1982).

In Illinois, a court may make an equitable award of pre-judgment interest in an action for breach of fiduciary duty. *See In re Estate of Wernick*, 127 Ill.2d 61, 129 Ill.Dec. 111, 535 N.E.2d 876, 888 (1989) ("The rationale underlying an equitable award of prejudgment interest in a case involving a breach of fiduciary duty is to make the injured party complete by forcing the fiduciary to account for profits and interest he gained by the use of the injured party's money."). However, the Illinois Interest Act does not provide for pre-judgment interest in tort cases. *See* 815 ILCS 205/2 (1997); *Matich v. Gerdes*, 193 Ill.App.3d 859, 140 Ill.Dec. 737, 550 N.E.2d 622, 631 (1990). At oral argument, counsel for Westchester conceded that pre-judgment interest is generally not awarded in tort claims and that the present case involves such a claim. Of course, Westchester argued at trial that it was equitably subrogated to the rights of St. Louis Slag. But we agree with the district court that Westchester's reliance on the doctrine of equitable subrogation does not convert Westchester's negligence action into an action sounding in equity. This is an instance where pre-judgment interest

would serve less as "a concept of fairness and equity" and more as "a sanction against the defendant." *Estate of Wernick,* 129 Ill.Dec. 111, 535 N.E.2d at 888. The district court did not abuse its discretion in denying Westchester's request for pre-judgment interest.

 Nor do we see any abuse in the district court's decision to deny attorney's fees. The Illinois Insurance Code provides for the recovery of attorney's fees as a component of the insured's remedy for insurer misconduct. *See* 215 ILCS 5/155 (1997). However, the statute "presupposes an action on the policy" whereas "nothing in the statute addresses tortious conduct or tort liability in general." *Cramer v. Insurance Exchange Agency,* 174 Ill.2d 513, 221 Ill.Dec. 473, 675 N.E.2d 897, 902 (1996). It is undisputed that Westchester's claim against GenStar sounded in tort. Thus, it did not bring an action "on the policy" that would entitle it to attorney's fees under § 155 of the Illinois Insurance Code.

AFFIRMED.