In the
United States Court of Appeals
For the Seventh Circuit

Nos. 98-2708, 98-3053

WILLIAM CEFALU and TYRONE CEFALU,

Plaintiffs-Appellants/Cross-Appellees,

v.

VILLAGE OF ELK GROVE, et al.,

Defendants-Appellees/Cross-Appellants.

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 94 C 1990--Rebecca R. Pallmeyer, Magistrate Judge./*

Argued February 23, 1999--Decided April 13, 2000

Before COFFEY, RIPPLE, and ROVNER, Circuit Judges.

ROVNER, Circuit Judge.  Cooler heads regrettably
did not prevail on the afternoon that Tyrone
Cefalu arrived at his parents' printing business
and found Elk Grove Village police officer Eric
Perkins parked in the drive, filling out reports
and monitoring traffic on the adjoining roadway.
Cefalu in rather harsh terms told Perkins to
leave, Perkins balked, and within moments six
police officers were on the scene attempting to
restore order to the chaos that had erupted.
Perkins left the premises with a lacerated hand,
having had the front door to the Cefalus'
business slammed shut on it. Tyrone and his
father William left with their own hands in
cuffs, accused of battery and resisting arrest.
After the Cefalus were acquitted on those
charges, they filed suit against Elk Grove
Village, Perkins, and several other police
officers pursuant to 42 U.S.C. sec. 1983, and the
case proceeded to trial. Judge Pallmeyer entered
judgment as a matter of law in favor of the
defendants on the charge that they conspired to
cover up evidence of violating the Cefalus' civil
rights, and a jury absolved the defendants of
false arrest, excessive force, battery, and
malicious prosecution. The Cefalus appeal from
both the entry of judgment as a matter of law and
the adverse verdict on the false arrest charge,
and they also challenge certain rulings that the
district court made over the course of the trial.

The defendants cross-appeal from the denial of costs for the preparation of various computer displays. We affirm the judgment in favor of the defendants and remand the matter of costs for further consideration.

I.

Because the jury found in favor of the defendants, our summary of the facts reflects a view of the evidence that is favorable to them. See, e.g., Haschmann v. Time Warner Entertainment Co., 151 F.3d 591, 599 (7th Cir. 1998).

Early in the afternoon of February 19, 1993, after picking up some take-out for lunch, Tyrone Cefalu ("Tyrone") returned to work at his family's Elk Grove Village business, Logan Printing ("Logan"). As he drove up to the property, Tyrone saw a village police cruiser parked in the driveway. Officer Eric Perkins, employed with the village for sixteen months, was seated behind the wheel. Perkins had just finished responding to an armed robbery call and had backed his cruiser into the driveway in order to complete some paperwork and monitor traffic on the adjacent street as he neared the end of his shift. According to the village, its police officers commonly did this in the industrial park where Logan Printing was located, and it had never before heard a complaint. Business owners, in fact, appreciated the visible police presence on their properties.

Tyrone did not welcome Perkins' presence, however. A short retaining wall divided Logan's driveway. One half of the driveway, leading to the loading dock, descended several feet below grade level. The other half of the drive led to parking in the rear of the building; and the presence of Perkins' cruiser on that side of the drive blocked access to the parking lot. Tyrone drove his vehicle onto the loading-dock half of the drive and pulled up along side of Perkins' car. "What are you doing here?" Tyrone asked Perkins--in what Perkins described as an insulting and combative tone. When Perkins answered that he was, among other things, watching traffic, Tyrone remarked that he did not want Perkins to "run radar" while on the premises. Perkins indicated that he was not using radar but that in any event he was entitled to employ it so long as there was traffic on the public road. Nonplused, Tyrone told Perkins to "get off"of his property. Perkins declined.

Tyrone stepped out of his vehicle, his lunch and drink in hand, and slammed the car door shut. For a few moments, he stood next to Perkins' car, shouting obscenities. He demanded that Perkins

"get the f\*\*\* off [his] property" and, pointing his finger at the police officer, called him a "f\*\*\*ing punk." In the face of Tyrone's outrage, Perkins was now concerned about the prospect of interrogation, and possibly discipline, from his superiors. He radioed his supervisor, Sergeant Dion Zinnel, that he was dealing with "an irate business owner." Other officers who heard the radio call could discern someone shouting in the background. Zinnel said he would join Perkins at the scene. Perkins exited the cruiser and joined Tyrone on the front sidewalk, hoping to calm him down.

Tyrone began to move away from the squad car. Perkins told him to come back, but Tyrone kept walking. After returning to the car for a moment to respond to a follow-up call from Zinnel, Perkins caught up with Tyrone in front of the business. Tyrone continued to yell at Perkins, threatening to call the village manager.

At Logan's front door, something of a tug-of-war ensued. After Tyrone opened the door with a key, he repeated his demand that Perkins get off the property, stepped inside, and let the door (which had an automatic closing mechanism) begin to shut behind him. Perkins planted his right heel and side in the doorway, keeping the door open. He urged Tyrone to calm down. "We don't need this," Perkins told him. Unmoved, Tyrone tried to pull the door closed. Perkins stopped the door with his hand. As Perkins told the story, Tyrone glanced at Perkins' hand and then yanked the door shut on it, lacerating Perkins' finger and thumb.

Thoughts of calming Tyrone down evaporated; Perkins now resolved to arrest him for battery. Having grabbed the door before it locked shut, Perkins now took a step inside the building, grasped Tyrone's arm, and announced that he was under arrest for disorderly conduct/1 as well as battery. Tyrone tried to shake his arm free of Perkins' grip. At this point, William Cefalu entered the fray, rising from behind a counter and shouting at Perkins to let Tyrone go and get off the property. Finding himself outnumbered, Perkins retreated from the building and called for backup.

When reinforcements arrived, Perkins knocked at the front door with a colleague, Officer Edwin Medina. William cracked open the front door and told them to depart, but the officers seized the opportunity to reenter the building, informing William that they were there to arrest Tyrone. William attempted to block Medina's path, prompting Perkins to declare that William would be arrested as well. When William refused to

place his hands behind his back per Perkins'
order, the two officers pushed William onto a
bench and struggled to handcuff him. Hearing the
commotion, Tyrone emerged from a back office and
shouted at the officers, "Let go of him!"
Tensions were so high at this point that Medina
drew his gun and ordered Tyrone to "Freeze!"
Tyrone instead picked up a telephone and
attempted to call the village manager. Perkins
tried--unsuccessfully--to take the telephone away
and cuff him. By now, Zinnel and another officer
had arrived on the scene, and they helped to
subdue and handcuff Tyrone.

   Perkins left the premises in the company of
paramedics so that his hand could be attended to,
while the Cefalus were taken to the Elk Grove
police station for processing. William himself
was treated by paramedics for a cut on his hand,
and was later taken to the hospital with elevated
blood pressure. By the plaintiffs' account,
William had turned quite red during the scuffle
at Logan Printing, and whereas the defendants
acknowledge that his blood pressure was
determined to be "slightly" elevated, the
plaintiffs insist that it shot off the charts,
leaving him with permanent damage to his heart
muscle.

   Following this incident, the village received
complaints from both Tyrone and his wife, and the
village board of trustees, recognizing the
possibility that litigation might be in the
offing, ordered an investigation. The village
attorney spoke with the chief and deputy chief of
police about the matter, and he obtained a copy
of the police report for the board's review.
Further investigation was suspended while the
criminal case against the Cefalus was pending;
and the board was kept apprised of the status of
the criminal case. Ultimately, the village
attorney made no effort to look into the incident
independently; he simply relied on the police
chief and deputy chief for their second-hand
accounts of what occurred. Nor did he take any
notes, prepare a written report, or create any
other form of written documentation of the
results of his inquiry.

   Several days after the Cefalus were arrested,
Sergeant Zinnel and Lieutenant Steven
Ingebrigtsen (watch commander at the time Perkins
arrested the Cefalus) met with Perkins to review
the incident. The senior officers agreed that
Perkins could have handled his initial encounter
with Tyrone better than he had and they so
admonished Perkins. "[W]e all said he could have
put the car in drive and drove away,"
Ingebrigtsen testified. Ingebrigtsen considered
this mild oral reprimand to be all the discipline

that was necessary. In his view, Perkins had not violated any departmental policy; he was simply an inexperienced officer who exercised poor judgment. Ingebrigtsen did not investigate the incident beyond speaking with Zinnel and Perkins. "I was satisfied with the information they supplied me," he testified. "I didn't need more." Like the village attorney, Ingebrigtsen made no written report summarizing his inquiry. In fact, it appears that none of the various personnel within the village bureaucracy who looked into this matter created any notes, memoranda, or correspondence reflecting what they found.

Meanwhile, William and Tyrone Cefalu were exonerated on the charges that they had committed battery and resisted arrest. At the conclusion of the State's case, Cook County Circuit Court Judge Brendan McCooey dismissed the charges. The judge noted that even if Perkins, in the first instance, had a legitimate reason to follow Tyrone up the front walk and to enter the Logan building, by the time Cefalu had stepped inside the front door and attempted to close it, Perkins had been told several times that he was not welcome on the premises. Perkins had no warrant that would justify his entry without the owner's consent, and no exigent circumstances supported a warrantless intrusion. Within that context, he found the evidence insufficient to show that either the senior or junior Cefalu had the intent to commit a battery on the police officers or to resist arrest. "The State failed to prove its case beyond a reasonable doubt, even set forth a prima facie case, in my opinion."

The Cefalus later filed this action against Elk Grove Village, Perkins, and six other police officers. Pursuant to section 1983, they asserted claims of excessive force, false arrest, malicious prosecution, and conspiracy. A direct claim against the village was made pursuant to Monell v. Department of Social Servs. of City of New York, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036 (1978). The complaint also included pendant state claims of battery, unlawful detention, malicious prosecution, conspiracy, wilful and wanton misconduct, excessive force, and false arrest. R. 65. Judge Holderman granted summary judgment in favor of the village on the Monell claim and dismissed one of the individual defendants from the case. Cefalu v. Village of Elk Grove, No. 94 C 1990, 1996 WL 392158 (N.D. Ill. July 11). He concluded that disputes of material fact required a trial on the other claims as to which the defendants sought summary judgment, however. With respect to the section 1983 conspiracy claim, Judge Holderman wrote:

[T]here is sufficient circumstantial evidence

from which a jury may reasonably infer that defendants conspired to violate plaintiffs' constitutional rights. There is evidence that defendants met and discussed the circumstances of the February 19, 1993 incident after the alleged constitutional violations occurred. The acts that defendants allegedly undertook in furtherance of this alleged conspiracy include the allegedly false charges brought against plaintiffs, defendants' failure to investigate the complaints made by plaintiffs, and defendants Perkins' and Medina's testimony at the criminal trial in support of the allegedly false charges.

Id., at *6 (footnote omitted). The case proceeded to trial on the federal claims for false arrest (Tyrone), malicious prosecution (Tyrone), excessive force, and conspiracy, and the state claims for false arrest (Tyrone), battery, and malicious prosecution. At the conclusion of the plaintiffs' case-in-chief, Judge Pallmeyer entered judgment as a matter of law in favor of the defendants on the claim that they had conspired to violate the plaintiffs' civil rights. R. 294-2 at 24; see Fed. R. Civ. P. 50(a)(1). The remainder of the case was submitted to the jury, which found in favor of the defendants on all counts. R. 237, 238. The Cefalus subsequently filed a motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a), which Judge Pallmeyer denied in a written opinion. Cefalu v. Village of Elk Grove, No. 94 C 1990, 1998 WL 325191 (N.D. Ill. June 9).

II.

A.

The Cefalus contend that Judge Pallmeyer erred when she entered judgment as a matter of law in favor of the defendants on the section 1983 conspiracy claim. Judgment as a matter of law is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). Our review of such a judgment is de novo. E.g., Lane v. Hardee's Food Sys., Inc., 184 F.3d 705, 707 (7th Cir. 1999). In the course of this review, we must interpret the facts in the light most favorable to plaintiffs, against whom judgment as a matter of law was entered. Id.

As it was articulated at trial, the Cefalus' conspiracy claim posited that the defendants had conspired to cover up their own wrongdoing vis a vis the Cefalus' arrest. The First and Fourteenth Amendments to the U.S. Constitution guarantee the right to seek legal relief for asserted injuries that have a reasonable basis in fact and in law.

See Bill Johnson's Restaurants, Inc. v. NLRB, 461
U.S. 731, 741, 103 S. Ct. 2161, 2169 (1983);
Vasquez v. Hernandez, 60 F.3d 325, 328 (7th Cir.
1995), cert. denied, 517 U.S. 1156, 116 S. Ct.
1545 (1996).

A corollary of this right is that efforts by
state actors to impede an individual's access to
courts or administrative agencies may provide the
basis for a constitutional claim under 42 U.S.C.
sec. 1983. Judicial access must be "adequate,
effective, and meaningful," Bounds v. Smith, 430
U.S. 817, 822, 97 S. Ct. 1491, 1495, 52 L.Ed.2d
72 (1977), and therefore, when police officers
conceal or obscure important facts about a crime
from its victims rendering hollow the right to
seek redress, constitutional rights are
undoubtedly abridged. Bell [v. City of
Milwaukee], 746 F.2d [1205] at 1261 [(7th Cir.
1984)]; see also Stone v. City of Chicago, 738
F.2d 896 (7th Cir. 1984); Ryland v. Shapiro, 708
F.2d 967 (5th Cir. 1983).

Vasquez, 60 F.3d at 328; see also Thompson v.
Boggs, 33 F.3d 847, 852-53 (7th Cir. 1994), cert.
denied, 514 U.S. 1063, 115 S. Ct. 1692 (1995).
Judge Pallmeyer entered the directed finding on
this claim primarily on the strength of Vasquez.
There we concluded (over a dissent) that an
attempt to cover up police wrongdoing which
succeeded only briefly in hiding the facts from
the plaintiffs, and which ultimately neither
prevented the plaintiffs from pursuing relief nor
reduced the value of their claim, was not
actionable under section 1983. 60 F.3d at 329;
see also Gibson v. City of Chicago, 910 F.2d
1510, 1523-24 (7th Cir. 1990).

   At the outset, the Cefalus suggest that the law
of the case doctrine/2 obligated Judge Pallmeyer
to submit their conspiracy claim to the jury, but
that argument is wholly without merit. The
premise for the argument is the court's previous
summary judgment ruling: Judge Holderman
concluded that there were disputed issues of
material fact with respect to the conspiracy
claim, the reasoning goes, and so Judge Pallmeyer
was bound to submit the claim to the jury. Yet,
as the defendants point out, what Judge Holderman
determined at the summary judgment stage was that
the evidence sufficed to establish the general
elements of conspiracy--a meeting of the minds,
overt actions taken in furtherance of the
agreement, and so on. He did not address--because
it was not raised--the particular theory
underlying the cover-up claim, and whether it was
viable under the controlling case law.
Consequently, there was no law of the case on
this aspect of the conspiracy claim.

For two reasons, we believe that Judge Pallmeyer was correct to enter a judgment as a matter of law in favor of the defendants on this claim. First, because the jury exonerated the defendants of any substantive constitutional violation, the conspiracy claim necessarily falters under this circuit's precedents. Second, the cover-up efforts that the Cefalus describe could not, given the facts of the case, have kept the Cefalus from seeking legal redress.

In exonerating the defendants of the false arrest and malicious prosecution charges, the jury concluded that the defendants did not violate the Cefalus' constitutional rights. We have said that "there is no constitutional violation in conspiring to cover-up an action which does not itself violate the Constitution." Hill v. Shobe, 93 F.3d 418, 422 (7th Cir. 1996). The jury's conclusion that the Cefalus suffered no constitutional injury thus forecloses relief on the conspiracy claim. Id.; Goldschmidt v. Patchett, 686 F.2d 582, 585 (7th Cir. 1982); see also Andree v. Ashland County, 818 F.2d 1306, 1311-12 (7th Cir. 1987); Reichenberger v. Pritchard, 660 F.2d 280, 285 (7th Cir. 1981).

Moreover, this was not a case in which the plaintiffs lacked the knowledge of the facts necessary to seek redress for their asserted injuries. The key circumstances underlying their claims for wrongful arrest and malicious prosecution were those surrounding their arrests. Those circumstances have from the start been known to the Cefalus, as they were face-to-face participants with the police in the entire chain of events that culminated in their arrest. Cf. Vasquez, 60 F.3d 325 (plaintiff injured by stray bullet of unknown origin that penetrated the walls of her home); Bell, 746 F.2d 1205 (plaintiff's son shot and killed by police officer in absence of witnesses other than officer and his partner, both of whom falsely claimed that victim had wielded a knife and declared himself to be a hold-up man). Therefore, even to the extent the evidence suggests that the defendants resolved not to conduct a meaningful investigation, for fear it would hurt them later when the Cefalus filed suit, a jury could not find for the plaintiffs on the cover-up claim because the facts that they needed to recover for their asserted injuries have always been known to them. See Thompson, 33 F.3d at 852-53; see also Swekel v. City of River Rouge, 119 F.3d 1259, 1263-64 (6th Cir. 1997), cert. denied, 522 U.S. 1047, 118 S. Ct. 690 (1998); Foster v. City of Lake Jackson, 28 F.3d 425, 429-30 (5th Cir. 1994).

For this same reason, we find no merit to the

Cefalus' follow-up contention that Judge Pallmeyer unduly restricted their attempts to flesh out the village's efforts to evade liability. The judge sustained defense objections to a variety of questions intended to show that the village treated Perkins with extraordinary lenity; that it explored the possibility of dropping the charges against William in exchange for Tyrone's agreement to plead guilty; that it had a practice of not dropping charges once an arrest had been effectuated; that the village, in effect, turned a blind eye to the merits of the charges against the Cefalus; and that village officials were keenly aware at all times that a conviction of one or both Cefalus would insulate them from liability. We may assume that further inquiry along these lines might have shown that the village was more concerned about damage control than it was about justice. Yet, even with the benefit of discovery, the plaintiffs can identify no information that the defendants suppressed or withheld, or any action that they took, that hampered the Cefalus from resorting to court to vindicate their constitutional rights. It is that type of evidence which their cover-up claim called for, and absent a showing that their questions would have elicited evidence that was relevant in this regard, the judge acted appropriately in terminating inquiry.

B.

The jury found in favor of Perkins on the claim that he falsely arrested Tyrone, but the Cefalus believe that the verdict cannot be reconciled with the evidence and that the judge should therefore have granted their motion for a new trial. See Fed. R. Civ. P. 59. Only when a verdict is contrary to the manifest weight of the evidence should a motion for a new trial challenging the jury's assessment of the facts carry the day. E.g., Riemer v. Illinois Dep't of Transp., 148 F.3d 800, 806 (7th Cir. 1998); Robinson v. Burlington N. R. Co., 131 F.3d 648, 656 (7th Cir. 1997). Moreover, "[t]he district court, having seen the presentation of the evidence and observed the course of the trial, is in a unique position to rule on a new trial motion." Valbert v. Pass, 866 F.2d 237, 239 (7th Cir. 1989). Our own review of the lower court's assessment is therefore "narrowly circumscribed." Id., quoting Durant v. Surety Homes Corp., 582 F.2d 1081, 1088 (7th Cir. 1978). Only if the district judge has abused her discretion will we disturb her decision to deny a new trial. E.g., Lowe v. Consolidated Freightways of Delaware, Inc., 177 F.3d 640, 641 (7th Cir. 1999), cert. denied, 120 S. Ct. 818 (2000); Riemer, 148 F.3d at 806. "As long as there is a reasonable basis in the record to support it, we will not overturn a jury's verdict." Robinson, 131 F.3d at 656.

The plaintiffs' attack on the verdict focuses upon the issue of trespass. Illinois law provides that one who intrudes upon another's property after receiving notice from an "owner or occupant" that he is forbidden to enter (or required to depart) is guilty of a misdemeanor. 720 ILCS 5/21-3(a); e.g., People v. Kraft, 660 N.E.2d 114, 117 (Ill. App. 1995). Illinois law further provides that "[a] person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's trespass . . . ." 720 ILCS 5/7-3. In the Cefalus' view, Perkins was a trespasser. The officer had no authority or permission to be on their property; and by the time the contretemps at the doorway commenced, Tyrone had in fact demanded repeatedly that he leave. Perkins claimed not to be sure whether Tyrone had the legal authority to eject him. Yet, he conceded that once he saw the junior Cefalu open the front door to the building with his key (and with his lunch in hand), it was clear that Tyrone at the very least had a right to be on the premises, if not as an owner (as Tyrone claimed to be), then as an employee. Plaintiff's Ex. 3 at 56-57. At that point, the plaintiffs argue, Perkins was obliged to leave, and Tyrone, in turn had a right to use force to evict him. Perkins therefore lacked the requisite probable cause to arrest Tyrone--i.e., an objectively reasonable belief that Tyrone had committed a crime when he shut the door on Perkins' hand. See generally, e.g., Kelley v. Myler, 149 F.3d 641, 646 (7th Cir. 1998).

We agree with Judge Pallmeyer, however, that the jury could reasonably have viewed the situation differently. Assuming that Perkins indeed did commit trespass, the Illinois statute permitted Tyrone to use force only "to the extent that he reasonably believe[d]" such force was necessary to terminate the trespass. 720 ILCS 5/7-3 (emphasis ours). The jury, examining the facts that confronted Perkins through the eyes of a reasonable police officer, might have determined that it was unreasonable for Tyrone to think it necessary to slam a door shut on Perkins' hand. All Perkins was doing at that point was attempting to keep the door open so that he could continue his efforts to talk Tyrone into a calmer state. If, as the Cefalus argue and we have assumed, Perkins was committing criminal trespass, then he of course had no business remaining on the property at all in the face of Tyrone's demands that he leave. But Perkins posed no threat to Tyrone, and beyond holding the door open so that he could speak with Tyrone, Perkins evidenced no plans to intrude farther into the building. Under the circumstances, however

annoying Perkins' continued presence may have been to Tyrone, the jury might well have thought that a reasonable police officer could deem it beyond the pale for Tyrone to close the door on his hand without at least warning him first. See People v. Hicks, 676 N.E.2d 725, 729 (Ill. App. 1997), rev'd on other grounds, 693 N.E.2d 373 (Ill. 1998); People v. Epps, 453 N.E.2d 816, 818-19 (Ill. App. 1983); People v. Vaughn, 451 N.E.2d 898, 902 (Ill. App. 1983). The unreasonable use of force would in turn have supplied a reasonable officer with a basis to arrest Tyrone for battery, which in Illinois occurs when a person "intentionally or knowingly without legal justification" causes bodily harm to another or touches him in an "insulting or provoking" manner. 720 ILCS 5/12-3(a); see also 720 ILCS 5/12-4(b)(6) (aggravated battery occurs when one commits battery on a person he knows to be a peace officer, while the officer is engaged in execution of his official duties)./3

C.

The Illinois criminal trespass statute indicates that it is an "owner or occupant" of the property who is authorized to order an unwelcome visitor to depart. See 720 ILCS 5/21-3(a). As we have noted, Perkins testified that he was unsure whether Tyrone was, in fact, an "owner" or "occupant" who could rightfully order him to leave, and the reasonableness of his doubt was a hotly contested issue at trial. On that issue, the jury was instructed that it could consider "whether it was reasonable for Officer Perkins to believe that the phrase 'owner or occupant,' as used in the statute, was limited to legal owners, tenants or lessees of real property." R. 236, Instruction No. 37. The Cefalus contend that it was clear error for the court to give this instruction, because it invited the jury to focus on Perkins' understanding of the statute rather than the facts that were known to him, the latter being key to the probable cause analysis. See Richardson v. Bonds, 860 F.2d 1427, 1430-31 (7th Cir. 1988) ("While an arresting officer's subjective knowledge of facts sufficient to constitute probable cause is central to evaluation of the propriety of an arrest, we do not believe that the officer's view of the legal basis for the arrest is important.") (emphasis in original); see also, e.g., Calusinski v. Kruger, 24 F.3d 931, 935 (7th Cir. 1994); Biddle v. Martin, 992 F.2d 673, 676 (7th Cir. 1993).

The Cefalus consented to this instruction below, however, and in so doing waived review of its propriety. Federal Rule of Civil Procedure 51 provides that "[n]o party may assign as error the giving or the failure to give an instruction unless that

party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." At the instruction conference, the Cefalus' counsel expressly agreed that the reasonableness of Perkins' belief as to whether Tyrone would qualify as an "owner or occupant" was, "[a]t a minimum," a jury question. R. 294-2 at 223. Counsel also gave his consent to the form of the instruction that the court proposed. R. 294-2 at 255-56. Under these circumstances, appellate review is foreclosed to the Cefalus. See O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc., 36 F.3d 565, 568 (7th Cir. 1994); see also United States v. Griffin, 84 F.3d 912, 924 (7th Cir.) (applying identical terms of Fed. R. Crim. P. 30), cert. denied, 519 U.S. 999, 117 S. Ct. 495 (1996), and cert. denied, 519 U.S. 1020, 117 S. Ct. 536 (1996)./4

D.

Finally, the Cefalus argue briefly that the district court erroneously precluded them from placing the text of the criminal trespass and related statutes before the jury. Alerting the jury to the content of those statutes was necessary, they maintain, because throughout the trial the defendants had improperly suggested (principally through objections to the questions plaintiffs' counsel put to Perkins and other witnesses) that a mere employee of the property owner (like Tyrone) did not have the authority to eject a trespasser. Confronting the witnesses with the actual text of the statute was therefore necessary, in their view, to counter the misimpression. The district court, of course, enjoys broad discretion on evidentiary matters, and our review is commensurately deferential. E.g., United States v. Van Dreel, 155 F.3d 902, 905 (7th Cir. 1998).

We discern no error on Judge Pallmeyer's part, however. Whether Tyrone qualified as an "owner or occupant" was a question of law to be addressed in the jury instructions. The Cefalus' sole objection to the adequacy of the jury instructions was one that they waived, as we have explained above. As an evidentiary matter, use of the statutory text in questioning the witnesses would only be relevant insofar as the text was somehow vital to eliciting pertinent testimony. However, the Cefalus make no argument that the judge's rulings in this respect somehow kept them from introducing relevant evidence.

III.

After prevailing at trial, the defendants moved to recover their costs pursuant to Federal Rule of

Civil Procedure 54(d). Among other expenses, they sought reimbursement in excess of $27,000 for the cost of a computerized, multi-media system they employed to present their exhibits to the jury. The plaintiffs used a similar methodology, and as Judge Pallmeyer noted, the defendants had elected to do the same in order "to keep the playing field even." Cefalu v. Village of Elk Grove, No. 94 C 1990, 1998 WL 409690, at *11 (N.D. Ill. July 15). The defendants argued that the multi-media system was compensable as a means of "exemplification," see 28 U.S.C. sec. 1920(4), but the judge rejected this rationale. "Costs for exemplification are permitted only for expenses associated with the physical preparation of exhibits," she observed. 1998 WL 409690, at *11./5 "[A]lthough the multi-media presentation no doubt facilitated the presentation of various exhibits to the jury, it played no role whatsoever in the production of the exhibits used at trial." Id. (emphasis in original).

In stating that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs," Rule 54(d)(1) establishes a presumption in favor of a cost award. To be compensable, however, a particular expense must fall into one of the categories of costs statutorily authorized for reimbursement. Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 441-42, 107 S. Ct. 2494, 2497 (1987); Barber v. Ruth, 7 F.3d 636, 644 (7th Cir. 1993). Fees associated with "exemplification" so qualify, sec. 1920(4), although the statute does not define the term. In the narrowest legal sense, "exemplification" refers to "[a]n official transcript of a public record, authenticated as a true copy for use as evidence." Black's Law Dictionary 593 (7th ed. 1999). More commonly, it signifies the act of illustration by example, Merriam-Webster's Collegiate Dictionary 406 (10th ed. 1993), a connotation broad enough to include a wide variety of exhibits and demonstrative aids. Our own cases embrace the more expansive definition of "exemplification." In EEOC v. Kenosha Unified School Dist. No. 1, 620 F.2d 1220, 1227 (7th Cir. 1980), we said that the term "is ordinarily construed as permitting an award of the reasonable expense of preparing maps, charts, graphs, photographs, motion pictures, photostats, and kindred materials . . . ," quoting 6 Moore's Federal Practice para. 54.77[6] at 1739 (2d ed.). And more recently in Haroco, Inc. v. American Nat'l Bank & Trust Co. of Chicago, 38 F.3d 1429, 1441 (7th Cir. 1994), we sustained an award of exemplification costs that included, among other things, the expense of graphics services employed in preparing exhibits for a successful summary judgment motion. See generally 10 Charles Alan Wright, et al., Federal

Practice and Procedure sec. 2677, at 453-58 (1998).

In this case, the judge drew a line between the physical preparation of a trial exhibit, which would be compensable as exemplification, and the means chosen to present that exhibit to the jury, which she believed would not be. We appreciate the convenience of that line, and there is a certain logic to it. Here, for example, the multi-media services for which the defendants seek compensation were auxiliary in the sense that these services did not involve the creation of diagrams, charts, or graphs, but merely the packaging and display of pre-existing documents and other exhibits. To that extent, the use of a multi-media presentation may have less to do with conveying information to judge and jury than it does with an effort to wow them. No doubt the statute does not obligate the losing party to pay for the victor's "glitz," as Judge Leinenweber has observed. BASF Corp. v. Old World Trading Co., No. 86 C 5602, 1992 WL 229473, at *3 (N.D. Ill. Sept. 11).

But in view of the illustrative purpose of exemplification, we are not convinced that the line between producing an exhibit and presenting that exhibit to the court is the most appropriate one to draw. Enlarging a crucial document, for example, may be the only practical means of permitting a witness to point out the forensic features of that document. Imagine, for example, the jurors and the judge poring over individual, unenlarged copies of the document with bifocals and magnifying glasses as they try to keep pace with an expert's testimony identifying for them the unique whorls of a fingerprint or swirls of a signature. Yet, the enlargement is simply a bigger version of evidence that already exists; in effect, it serves only to present that evidence in a more effective manner. In a like vein, a witness may require the use of a transparency so that she can explain or highlight the pertinent aspects of a chart she has prepared. That transparency would be worthless without the overhead projector needed to display it to the judge and jury; but the projector plays no role in the production of the exhibit, it is simply the means of presentation. Allowing fees for the cost of preparing the transparency but not for renting the projector would in this sense be a highly formalistic distinction, as each is key to the illustrative function of the exhibit.

So long as the means of presentation furthers the illustrative purpose of an exhibit, we believe it is potentially compensable as exemplification. This approach allows appropriate room for the more sophisticated types of multi-media presentations made possible by

technological advances. Given the costs associated with some of these presentations, this is an area that Congress may wish to revisit and supply further guidance. But we find no limits inherent in the term "exemplification" that would permit a court to award costs for the more familiar means of illustration--models, charts, graphs, and the like--but preclude it from compensating a party for an animated reconstruction of an accident, for example, or other types of computer-based, multimedia displays.

Of course, even when a particular item qualifies as exemplification, a court must still determine whether it was "necessarily obtained for use in the case." sec. 1920(4). The district judge is uniquely suited to make that assessment, and we will not disturb her judgment in this respect absent a clear abuse of discretion. See Weeks v. Samsung Heavy Indus. Co., 126 F.3d 926, 945 (7th Cir. 1997); Illinois v. Sangamo Constr. Co., 657 F.2d 855, 867 (7th Cir. 1981). Among the factors that the judge might consider in evaluating the necessity of a particular type of exemplification is whether the nature and context of the information being presented genuinely called for the means of illustration that the party employed. In other words, was the exemplification vital to the presentation of the information, or was it merely a convenience or, worse, an extravagance? See, e.g., McDowell v. Safeway Stores, Inc., 758 F.2d 1293, 1294 (8th Cir. 1985) (per curiam). Exemplification that was not reasonably necessary to the presentation of one's case to the court does not qualify for reimbursement under section 1920(4)./6 See McIlveen v. Stone Container Corp., 910 F.2d 1581, 1584 (7th Cir. 1990) (per curiam); Kenosha Unified School Dist. No. 1, 620 F.2d at 1227-28.

Moreover, a finding that the exemplification was "necessarily obtained for use in the case" does not definitively resolve the question of reimbursement either. Rule 54(d) makes quite clear that although there is a presumption in favor of a cost award to the prevailing party, the district court retains the discretion to direct otherwise. Crawford Fitting Co., 482 U.S. at 441-42, 107 S. Ct. at 2497. In all cases, therefore, the court retains the equitable authority to deny compensation to a prevailing party for costs that are compensable under the statute. Ibid.; see also SCA Servs., Inc. v. Lucky Stores, 599 F.2d 178, 180 (7th Cir. 1979); but see Weeks, 126 F.3d at 945 ("the court must award costs unless it states good reasons for denying them").

In this case, Judge Pallmeyer denied the award

of costs for the multi-media presentation based solely on her determination that such costs resulted from the presentation of exhibits rather than the physical preparation of them. As the foregoing discussion indicates, we believe that prevailing parties can, under appropriate circumstances, be reimbursed for the cost of computer generated, multi-media presentations even to the degree that such presentations are used not to produce exhibits but rather to display them to the court. Consequently, we cannot sustain the denial of costs for the reason Judge Pallmeyer articulated. It may be that the judge would have reached the same conclusion on other grounds--she might conclude that the multi-media system that the defendants employed was not reasonably necessary or that equitable considerations otherwise militate against part or all of the costs the defendants have sought for this system. She did not reach these considerations, however, and it is not our place to predict how she would resolve them. We will therefore remand the matter of costs for further consideration.

IV.

We affirm the judgment in favor of the defendants. The denial of costs to the defendants for use of the computerized, multi-media system is vacated and remanded for further consideration consistent with this opinion. Costs to the defendants.

/* Judge Pallmeyer presided over the trial of this case with the consent of the parties. Subsequent to the completion of the trial, the United States Senate confirmed her appointment to serve as a District Judge.

/1 Perkins thought--incorrectly, he was later informed--that directing profanity at a police officer constituted disorderly conduct.

/2 See generally Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 815-17, 108 S. Ct. 2166, 2177-78 (1988); Arizona v. California, 460 U.S. 605, 618-19, 103 S. Ct. 1382, 1391 (1983); Best v. Shell Oil Co., 107 F.3d 544, 546 (7th Cir. 1997).

/3 Because the jury could have concluded that Perkins might reasonably have believed he had probable cause to arrest Tyrone for battery, we need not consider whether Perkins' belief that Tyrone had also engaged in disorderly conduct was also reasonable.

/4 We acknowledge that due to a medical emergency in his family, the plaintiffs' lead counsel was absent from the jury instruction conference. Nonetheless, the plaintiffs were represented at the conference by his co-counsel. Furthermore, the Cefalus' lead counsel received a final set of the instructions on the morning of closing argument and was present when the jury was later charged. Consequently, he had ample opportunity to object before the jury retired to deliberate, as Rule 51 requires. His failure to do so confirms that appellate review is foreclosed, as we have been unwilling to extend the plain error doctrine to civil jury instructions given the unequivocal terms of the rule. See, e.g., Carter v. Chicago Police Officers, 165 F.3d 1071, 1077 (7th Cir. 1998), citing Deppe v. Tripp, 863 F.2d 1356, 1361-62 (7th Cir. 1988); Knox v. Indiana, 93 F.3d 1327, 1333 (7th Cir. 1996).

/5 The court cited two cases for the proposition that recovery under section 1920(4) is limited to the expense of physically preparing exhibits: Zuill v. Shanahan, 80 F.3d 1366, 1371 (9th Cir. 1996), cert. denied, 519 U.S. 1090, 117 S. Ct. 763 (1997), and In re Air Crash Disaster at John F. Kennedy Int'l Airport, 687 F.2d 626, 631 (2d Cir. 1982). The line that these cases draw, however, is one between the cost of conducting the research and analysis eventually reflected in the exhibit, and the cost of actually preparing the exhibit itself. The latter expense is deemed compensable while the former is not. See, e.g., Zuill, 80 F.3d at 1371 ("Fees for exemplification and copying 'are permitted only for the physical preparation and duplication of documents, not the intellectual effort involved in their production.'"), quoting Romero v. City of Pomona, 883 F.2d 1418, 1428 (9th Cir. 1989). Consequently, these cases do not address the precise question presented here.

/6 For parties who are concerned about the prospect of reimbursement for costly exemplification, we take the opportunity to repeat that the issue may be raised in advance of trial pursuant to Federal Rule of Civil Procedure 16(c)(4) and (c)(16). See Wahl v. Carrier Mfg. Co., 511 F.2d 209, 217 (7th Cir. 1975); see also 3 Business and Commercial Litigation in Federal Courts sec. 47.5(a), at 813-14 (Robert L. Haig ed.) (West Group & ABA 1998); 10 Charles Alan Wright, et al., Federal Practice and Procedure sec. 2677, at 458 (1998).